[No. 6793.]

GREEN VALLEY DITCH CO. ET AL. v. FRANTZ ET AL.

WATER RIGHT—*Abandonment*—Failure for the period of eighteen years to apply to beneficial use, or in any manner control, water to which one is entitled, must be regarded as an abandonment of the right, unless some peculiar condition excusing the delinquency is shown. Merely asserting a claim to the right through a continuous chain of paper title, even though coupled with an oral assertion of the right upon a single occasion, will not suffice.

The evidence examined and *held* to lead to the irresistible conclusion that those under whom plaintiffs claimed had abandoned the right.

*Error to Denver District Court.*—Hon. HUBERT L. SHATTUCK, Judge.

Mr. JOHN W. HELBIG and Mr. D. B. KINKAID, for plaintiffs in error.

Messrs. BARTELS & SILVERSTEIN and Messrs. ALLEN & WEBSTER, for defendants in error.

Mr. JUSTICE HILL delivered the opinion of the court:

This action was brought by The Green Valley Ditch Company (a corporation) on behalf of itself and its stockholders against the defendants in error, Frantz and Benton, for the purpose of quieting its title, and that of its stockholders, in and to a certain ditch and the appurtenances thereunto belonging, including appropriations. The defendants by their answer claim an interest in the ditch and the waters carried therein. They prayed that they be adjudged the owners of a certain interest in the ditch and water. The allegations in the answer are denied. The judgment was in favor of the defendants quieting their title to one-twenty-sixth of the water theretofore used upon any or all of the lands lying under the ditch. It also gave them the right, without interference, to its use and enjoyment, through the ditch, subject to prorating in times of scarcity. The plaintiffs bring the case here for review upon error.

Upon September 23rd, 1907, the defendants entered into a contract with its then owners to purchase block 5, Manchester, which, including streets and alleys, contains about five acres. They are in possession and claim that a certain interest in the ditch and waters carried therein belongs to this land. Upon October 1st, 1907, they made written demand upon the plaintiff company to have such interest recognized and water furnished therefor. Upon January 24th, 1908, this demand was formally refused; this suit was instituted upon the same date.

The main contention pertains to the abandonment by the predecessors in interest of the defendants to that portion of the ditch and waters theretofore appertaining to this land. There is but little conflict in the evidence. There is an absence of evidence pertaining to some matters, although apparently sufficient to satisfy both sides. This pertains particularly to the amount of water to which the ditch is entitled, and the date of its appropriation. No decree covering these questions

was plead or offered in evidence. It appears to be assumed by counsel (and for the purposes of this case we shall so treat it), that the pleadings and evidence discloses that this ditch has, or did have, an appropriation of 2.25 cubic feet of water per second of time from the South Platte river, and 2 cubic feet of water per second of time from a small tributary called Sand creek. The dates of these appropriations, so far as the pleadings or any evidence is concerned, are not attempted to be fixed.

The record discloses, that between 1868 and 1880 a small ditch was constructed about two and one-half miles in length; that its headgate was located on the west bank of the South Platte river, from whence it runs in a northerly direction; that it crosses this so-called Sand creek about half way down; that as early as 1885 Hiram and Artemecia Epperson (husband and wife) were the owners of eighty acres of land in section 21 and of seventy acres in section 15, all in township 4, south range 68 west; that this ditch (called the Epperson ditch) was used exclusively for irrigating some portions of this land and was evidently considered as appertaining thereto; that the house in which the Eppersons then lived was situate in section 21; that the portion covered by the building thereafter became a part of block 5, Manchester; that in 1887 the Eppersons began to sell off portions of this land, which sales included water out of, or an interest in the ditch therefor; that considerable of this land was sold and has ever since been used for gardening purposes, and has been continuously irrigated through this ditch; that these are the lands owned by the stockholders of the plaintiff company; that they are lower down the ditch than block 5 in Manchester; that in 1888 the ditch was in a dilapidated condition; that in 1888 or 1889 a meeting of consumers was held for the purpose of devising ways and means to repair and put the ditch in proper condition, it being then partially obliterated in places and out of repair; that Hiram Epperson and wife were present at this meeting, and when requested to assist in such repairs and maintenance for the benefit of lands

then owned by them, including block 5; Manchester, they refused to do so, and, in substance, said that they did not need the ditch, that they were not using water from the Platte river, and had no further use for it and told the plaintiffs that the ditch was theirs, to take it.

The evidence discloses beyond contradiction that the Eppersons did not use the ditch from the South Platte river to where it crosses Sand creek, or secure any water from the South Platte river, or in any manner assist in its maintenance or participate in its control, above Sand creek since 1886. There is evidence that they used the ditch below Sand creek and run a small amount of water, through it, obtained from Sand creek, during the years 1887, 1888 and possibly 1889. The contention of the defendants is, that the Eppersons' refusal to contribute was limited to that portion of the ditch above Sand creek, but it is undisputed that they never used, or contributed to repair, or thereafter assisted in maintaining the ditch above Sand Creek, after 1886, or below that point after 1889, but that during 1888 and 1889 and thereafter the company's stockholders, or their predecessors in interest, reconstructed, repaired and cleaned out, whenever necessary, the entire ditch at considerable expense; that they constructed a dam in the Platte river at a cost of about $2,000, and thereafter maintained the ditch at an expense of from three to five hundred dollars a year, and ever since have had the exclusive use and enjoyment of the entire ditch and waters run therein. The record is not clear as to the amount of water, from where secured, or upon what portions of these lands used, or the extent of such use upon any of them, prior to 1887.

In November, 1889, the original plat of Manchester or Manchester addition was filed. This was signed by Hiram and Artemecia Epperson with the usual dedications of streets, alleys, etc.; it covers portions of these lands then owned by the Eppersons, including what is termed their old home site covered by block 5. About November, 1889, the land then

owned by the Eppersons covered by this plat was conveyed to McCallum, who, in November or December, same year, conveyed it to The Manchester Land Company; this included block 5. In June or July, 1890, this company proceeded to destroy the whole length of this ditch where it crossed the streets and blocks in Manchester. Upon August 2nd, 1890, a suit was instituted by the stockholders of this plaintiff and some of their predecessors in interest against The Manchester Land Company to restrain it from destroying the ditch upon its lands, or in any manner interfering with their running water through it. This resulted in an agreement between the then owners of the land (which included this block 5) and the consumers, whereby the land company allowed them to reconstruct the ditch in a certain manner, and have the exclusive use and enjoyment thereof during the pendency of the action. What disposition was made of this suit is not disclosed, but the consumers continued to operate and have the exclusive use and control of the ditch, as before, without any adverse claim being made by anyone until about the time of the institution of this suit, during which period they increased their acreage irrigated from thirty-three and one-half to about fifty acres.

It is proper to observe that the stipulation entered into in the suit between the land company and the consumers recognizes the latter as being the owners of the ditch, in the following language, "The Manchester Land Company will convey all water which the plaintiffs may bring down in their old ditch." It will be noted that at this time it made no claim to either ditch or water, but was attempting the destruction of the former.

In October, 1906, these consumers incorporated the plaintiff and executed a deed to it for the ditch, etc., accepting its stock in payment therefor; reserving, however, the water rights and appropriations as theretofore owned and enjoyed by them. This evidently was for the purpose of providing a regular system for the maintenance of the ditch and the distribution of water to those entitled thereto. This ditch company,

at all times thereafter, continued to operate and manage the property. Other than the deed to it by its stockholders, there does not appear to have ever been any deeds executed by anyone for a right of way for the ditch. In addition to the stipulation referred to in the other suit, there are some reservations in some of the instruments executed by the Eppersons pertaining to some of this land, recognizing this ditch as having a right of way.

The record further discloses, that about 1891 these water consumers had trouble with a paper mill company, which, in building a large plant, destroyed a part of the canal, and, to avoid litigation, they (under protest) allowed the company to substitute a pipe line for eight or nine hundred feet and to change this right of way from where it originally was situate upon the Manchester and other lands, and for this distance to run the pipe line upon the right of way of a railway company; that since which time there has never been any flume, pipe or laterals or other means by which water could be conveyed to block 5, Manchester.

The defendants' evidence discloses, that a deed of trust was given back to the Eppersons, or one of them, upon the Manchester land; that The Manchester Land Company failing to pay in 1897 deeded back (in lieu of foreclosure) the premises in question to Mrs. Epperson; that thereafter she conveyed to L. Cook, trustee, who thereafter, in April, 1901, conveyed to William P. Epperson and Frank Steinmetz, who thereafter, in 1904, conveyed them to Lenora Epperson, who thereafter conveyed them to Louis and Theodore Bartels, who shortly prior to the bringing of this action entered into the agreement of sale with the defendants in error. It is proper to state that these sundry conveyances and others included therein declarations of all water rights belonging and appertaining to the land conveyed. This chain of paper title is all the uncontradicted evidence that the defendants introduced pertaining to non-abandonment, or intention by any of the owners of this land to claim any interest in the ditch or water.

The only other evidence upon this subject is that of William P. Epperson (a son of Hiram Epperson, and stepson of Mrs. Epperson), who states that in a conversation with sundry of these water consumers about six or seven years prior to the bringing of this suit, he asserted a right to the use of this water. This was denied by the plaintiff's witnesses. It is further disclosed that the contract of purchase from Bartels to the defendants concludes with the following paragraph, "In the event that no water rights belong to said land, then the above one hundred ($100) dollars to be refunded, and this receipt to be null and void."

In *North American Exploration Co. v. Adams*, 104 Fed. 404, wherein rights to water in Colorado were involved, it is said:

"The abandonment of the right to divert and use the waters of a stream is not different in its nature or character from the renunciation of any other right which is asserted and maintained by its use. It may be express or implied. It may be effected by a plain declaration of an intention to abandon it, and it may be inferred from acts or failures to act so inconsistent with an intention to retain it that the unprejudiced mind is convinced of the renunciation."

In *New Mercer Ditch Company v. Armstrong*, 21 Colo. 357, it was held that a corporation may not divert water from a stream and make beneficial use of a portion thereof, and as to the residue so diverted never make any use whatever for over twenty years from the time of the original diversion, for more than eighteen years from the time of an additional diversion, and for more than nine years after its rights to the quantity theretofore diverted have been judicially established, and then be heard to assert its claim to such excess after subsequent appropriators have continuously, adversely, openly and notoriously been enjoying the use thereof for such lengths of time.

In *Alamosa Creek Canal Company v. Nelson*, 42 Colo. 140, this court held that non-use of water continued for a

considerable time, coupled with other acts showing an intention on the part of the owner not to resume or to repossess himself of the thing whose use he has relinquished, constitutes abandonment.

In *Sieber et al. v. Frink et al.*, 7 Colo. 148, it was held that a failure to use water·is competent evidence of an abandonment of the right thereto, and if continued for an unreasonable period it creates a presumption of an intention to abandon; but this presumption is not conclusive and may be overcome by other satisfactory proof.

When these well known rules are considered in connection with our recognized doctrine of priority by appropriation, without attempting to lay down any definite rule pertaining to the length of time necessary to create the presumption of abandonment upon account of non-use, coupled with other acts, although slight, disclosing an intention to abandon, it may well be said that a period of twenty years or even eighteen years is too long a time for an individual or corporation to be permitted to thereafter make claim to an appropriation without having asserted a right thereto, or attempting to convert, control or in any manner to apply it to a beneficial use during some portion of that period, unless some peculiar fact or condition can be shown by which the party or parties might be excused during that length of time, and such excuses must be other than making a claim thereto down through a continuous chain of paper title. Here no excuse is given or peculiar circumstances attempted to be shown; but to the contrary, during all this time the predecessors of these .defendants sat silently by and allowed not only the plaintiffs to act as above set forth, but allowed other consumers both up and· down the river to construct many ditches and reservoirs, and invest large amounts in the construction thereof, and the diversion and application of waters to a beneficial use, without any assertion of right upon behalf of the predecessors of the defendants to the ownership or right to use any of the waters from said streams.

Outside of the alleged paper title, the only conflict in the evidence pertaining to abandonment is in the alleged declaration of one of the predecessors in interest of the defendants, who says that some seven or eight years before suit he claimed the right to a portion of the water in said ditch. This was disputed, but if true it was but an oral statement followed by no act, for which reason it could not change conditions.— *Hewitt v. Story,* 40 L. R. A. (Calif.) 265. While upon the other hand the undisputed declaration of his predecessors, to-wit, his father and stepmother, is to the fact that they declined to participate in the expenses of the reconstruction of the ditch, and the repairs and maintenance therefor, or in its use thereafter, stating in substance that they had no use for it, that it belonged to the plaintiffs, for them to go take it, etc. Later, their grantees made an effort at the complete destruction of the canal by plowing it in for about twelve hundred feet, wherever any street or alley in Manchester was to cross it, and they persisted in thus having it destroyed until a suit was instituted against them with the view of restraining them from accomplishing such destruction. This contention was thereafter adjusted under some arrangement by which the plaintiffs were allowed to reconstruct, and have enjoyed its use ever since, as theretofore.

It is also undisputed that the grantors of these defendants never made any claim to any interest in the ditch or waters, and that the defendants in buying had notice of conditions and protected themselves by the clause referred to in their contract of purchase. It is evident that the trial court misconstrued the legal effect of the evidence.

The facts are along the same lines as those in *Dorr v. Hammond,* 7 Colo. 79. The conclusion is irresistible, upon a review of the whole record, that the appropriation acquired by the Eppersons for the lands now claimed by the defendants by means of the application of water upon a portion of it, through this ditch, on and before 1887, 1888 and 1889, was afterwards abandoned. The testimony shows that no water

was thereafter taken through this ditch from either the Platte river or Sand creek for this land, and no claim made by any owners of it that they be furnished with any water until after the contract of purchase by the defendants in October, 1907, a period of over twenty years, when applied to the south Platte river and that portion of the ditch above Sand Creek, being about one-half of the ditch, and a period of eighteen years or over, when applied to the lower end of the ditch and the waters derived from Sand creek. During this entire period, the Eppersons as well as all subsequent owners, interposed no objections to the plaintiffs' application of all the waters that the ditch would carry, but to the contrary not only stood by and saw them partially reconstruct the ditch at considerable expense, also continue its maintenance, but permitted them, during all these years, to divert all the waters carried through the ditch, without even notifying them of their claim thereto other than the one alleged statement of the son, William P. Epperson, (which is in dispute). It is undisputed that the town site company attempted the destruction of the entire ditch through the land platted by the Eppersons while the company was the owner and in possession. These facts all tend to show a voluntary yielding up and waiver of the priority acquired by Eppersons (not sold to the other consumers) without any intention of resuming it and constitute a clear case of abandonment.

The plaintiffs are entitled as against the defendants to a decree quieting their title to the ditch and waters appropriated by them and their predecessors in interest heretofore carried therein to the extent of such appropriations from both the South Platte river and Sand creek. These should be limited to the amount that they have heretofore enjoyed as disclosed by the evidence, which is to be tested by the amount heretofore actually carried through the ditch and pipe line and applied to a beneficial use, making the necessary allowance for seepage and evaporation. When the amount of land heretofore irrigated, the capacity of the pipe line constituting a part of the

ditch and the waters heretofore carried are considered, it is evident that it does not exceed 2.90 cubic feet of water per second of time from both sources.

The judgment is reversed and the cause remanded with instructions that a decree be entered in harmony with the views herein expressed.                              *Reversed.*

CHIEF JUSTICE MUSSER and Mr. JUSTICE GABBERT concur.